### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

ALLEN D. MORRIS,
      Plaintiff,

     v.

UNITED STATES OF AMERICA,
et al.,
      Defendants.

CIVIL NO. 12-2926(NLH) (JS)


**OPINION**

**APPEARANCES:**

ALLEN D. MORRIS
7 COUNTRY CLUB DRIVE
BRIDGETON, NJ 08302
*Pro Se Plaintiff*

ELIZABETH ANN PASCAL
U.S. DEPARTMENT OF JUSTICE
OFFICE OF THE U.S. ATTORNEY
401 MARKET STREET
P.O. BOX 2098
CAMDEN, NJ 08101
*Attorney for defendants Dominick Ferrari, Douglas Herbert, Mark Rowe, Steve Brown, and Richard Henderson*

ROBERT P. MERENICH
GEMMEL, TODD & MERENICH, P.A.
767 SHORE ROAD
P.O. BOX 296
LINWOOD, NJ 08221
*Attorney for defendant City of Pleasantville*

**HILLMAN**, District Judge

    Before the Court are Plaintiff's motion for reconsideration and motion to amend his complaint. Also before the Court are motions for summary judgment filed by Defendants Dominick Ferrari, Douglas Herbert, Mark Rowe, Steve Brown, Richard Henderson, and the City of Pleasantville. For the reasons set forth below, Plaintiff's motion for reconsideration will be

denied, his motion to amend his complaint will be denied, and Defendants' motions for summary judgment will be granted.

## I. FACTUAL BACKGROUND

Plaintiff, Allen Morris ("Plaintiff" or "Morris"), brought a civil rights action against Defendants based on events that occurred on May 18, 2010, when he was arrested at his home.  The events leading up to the arrest are not in dispute and are as follows.

On May 4, 2010, two detectives from the New Jersey State Police ("NJSP"), Major Crime Unit, Detective Glenn Garrels and Detective Chris Scott, went to Plaintiff's residence to locate Adam Bard ("Bard").  Bard is Plaintiff's brother-in-law and, at the time, had several outstanding arrest warrants.  Bard was wanted for questioning in a homicide investigation into the death of an 81-year-old woman a month earlier.  Detective Garrels and Detective Scott spoke with Plaintiff, who confirmed that Bard resided with him and Bard's sister, Angela Bard, Plaintiff's then-fiancée and now wife.  Plaintiff told the Detectives that Bard was not home.  Plaintiff would not permit the Detectives to search the home for Bard without a search warrant.  Garrels and Scott did not enter the home, but requested assistance from the United States Marshals Service's NY/NJ Regional Fugitive Task Force ("Task Force") to locate Bard.

2

On May 13, 2010, three members of the Task Force, Defendants Steve Brown, Dominick Ferrari, and Mark Rowe[1] returned to Plaintiff's residence to locate Bard.  Plaintiff informed them that Bard was not at home and he would not permit them to search the house without a search warrant.[2]

On May 18, 2010, at approximately 6:30 a.m., Task Force Officers ("TFOs") and the NJSP K-9 Unit South went to Morris' house again in the continuing effort to locate Bard.  The TFOs and members of the NJSP K-9 Unit set up surveillance at the residence.  When Angela Bard left the home and drove off in her car, TFOs Brown, Ferrari, and another task force officer, Steven Melchiore, followed her and stopped her car.  They approached Angela and asked whether her brother was at home.  Angela was not sure so she called Morris on her cell phone.  Morris, who was sleeping at the time of the call, got out of bed to check.

---

[1] The named Defendants were members of the joint task force. Detective Dominick Ferrari was employed by the City of Vineland. Detective Sergeant Mark Rowe and Detective Steven Brown were employed with the New Jersey State Police.  Detective Douglas Herbert was employed by the Atlantic County Sheriff's Office. Detective Dee Henderson was employed by the Pleasantville Police Department.

[2]  The NJSP investigation report states that Plaintiff told the officers that even if he knew where Bard was, he would not tell them because it is their job to find him, and that Plaintiff refused to take the officer's telephone number.  The report also states that Plaintiff backed out of his driveway and yelled obscenities at them.

Angela heard Morris knock on her brother's bedroom door and call her brother's name; she heard her brother's response; and she heard Morris tell Bard to get up because the Marshals were coming to pick him up.  Angela verified for the TFOs that Bard was in the house.  Meanwhile, the law enforcement officers who had remained at the Morris residence set up a perimeter around the house.

After Brown, Ferrari, and Melchoire returned to the Morris residence, the TFOs approached the residence, took up tactical positions outside the house, and knocked on the front door several times.  After approximately a minute of knocking, Morris opened the window overlooking the front of the house and asked the TFOs what they wanted.  The TFOs responded that they had a warrant for Bard and to open the front door.  Morris walked away from the window, informing the TFOs that they were not coming in the house.  The TFOs continued to knock, directing the occupants to open the door or it would be forcibly opened.  After these efforts failed, Rowe gave the order to breach the door.  Herbert used a battering ram and forced the front door open.  The TFOs secured the first floor where neither Bard nor Morris were found.  Some of the TFOs then took up tactical positions at the bottom of the stairs, while others searched and held the kitchen area.  Rowe was assigned the rifle (long gun); Melchoire was

assigned the shield; Herbert was assigned the ram; and Brown, Ferrari, Henderson, and Herbert were assigned "cover control" and "hands on," if necessary.  The remaining law enforcement officers were outside covering the front and rear of the property and the canine.  The TFOs yelled several times to Bard that he was under arrest and to come downstairs with his hands above his head.  Bard came downstairs, complied with the TFOs commands, and was handcuffed without incident.  Ferrari then took Bard out of the home.

The TFOs then yelled to Morris that he was under arrest, and they directed him to come downstairs with his hands above his head.  Morris did not respond so the TFOs warned Morris that a police dog would be brought in if he did not comply with their commands.  Morris still did not respond.  Rowe directed the K-9 Unit to bring in the police dog.  Once the dog crossed the threshold, he began to bark.  Morris then yelled that he was coming down.  Morris appeared at the top of the stairs talking on a cell phone.  Morris was on the phone with the NJSP Office of Professional Standards complaining that the TFOs had entered his house without a warrant.[3]  TFOs shouted for him to drop the

---

[3] Standard procedure is to record all calls to the NJSP Office of Professional Standards hotline.  Since the NJSP Office of Professional Standards hotline was still on the call during the arrest, Morris's entire arrest was recorded.

phone and walk down the stairs.  Morris walked down the stairs
and then was instructed to lie face down on the stairs so he
could be handcuffed.  Morris did not lie down, so Henderson
pulled Plaintiff down by his belt loop.  Morris was directed to
place his hands behind his back but did not do so.  A struggle
ensued and the TFOs instructed Morris to stop resisting.
Henderson straddled Morris in his hip area in an effort to
handcuff him.  Henderson was unable to pull Plaintiff's right
arm behind his back because Plaintiff had his arms on the stairs
above his head.  Plaintiff testified that he was not able to put
his hands behind his back because he was on the stairs and that
when Henderson would try to "snatch" his right arm and bring it
behind his back, his arm would "bounce" back to its original
position.

Melchoire then came from the left side of the stairs to
help Henderson handcuff Morris.[4]  Henderson and Melchoire told
Morris to release his arm from the stair.  Henderson lost his
balance and fell on Morris.  To handcuff Morris's right arm,
Henderson had to pull his right arm behind him.

Morris was placed under arrest for obstruction, hindering
apprehension, and resisting arrest.  Henderson escorted Morris

---

[4]  Defendants point out that Plaintiff was 6'3", 225 pounds at
the time of the arrest.

from the home, followed by Brown.  Rowe and Melchoire proceeded
to clear the second floor of the house.  Before they left, Rowe
picked up the cell phone Morris dropped, noticed that it said
"SP OPS" on the display, closed it, and left it on the stairway
banister.  Defendants maintain that none of the TFOs struck
Morris during the entire incident, although this is disputed by
Plaintiff.  Plaintiff maintains that he was hit with the butt of
a gun during the arrest.

Morris was transported to the NJSP Bridgeton Station for
processing.  None of the TFOs observed an injury to Plaintiff
after his arrest.  Defendants have submitted a black and white
copy of a photograph of Plaintiff while handcuffed and standing
between two TFOs, to support their claim that Morris did not
exhibit any injuries after his arrest.  Defendants state that
despite not exhibiting any injuries, Plaintiff was asked if he
wanted medical attention, but he refused.  Plaintiff testified
he did not know he was injured.  Morris was released on his own
recognizance.  Angela Bard came to the station, picked up
Morris, and took him home.  Plaintiff states that after he went
home, he noticed redness and swelling in his eye.  He states
that he went to the hospital and was diagnosed with a fractured
orbital lobe.

On December 15, 2010, and on January 19, 2011, Morris's criminal trial was held in the Fairfield Township Municipal Court, New Jersey.  At the conclusion of the trial, the municipal court judge found Morris guilty of obstruction, hindering apprehension, and resisting arrest.  Morris appealed his convictions to the New Jersey Superior Court.  On June 10, 2011, the Superior Court Judge upheld the resisting arrest conviction but found Morris not guilty of hindering apprehension or obstruction.  Morris appealed the resisting arrest conviction to the New Jersey Appellate Division.  The Appellate Division upheld Morris' conviction for resisting arrest.

Plaintiff alleges that there was no probable cause for his arrest.  Plaintiff asserts that he did not pose an immediate threat to the safety of the defendants, that he was not actively involved in escape, and that he was not resisting arrest.  Plaintiff states that defendants used excessive force by striking him in the face causing a fracture to his orbital bone that required medical treatment.

## II.  PROCEDURAL BACKGROUND

Plaintiff filed his original complaint on May 16, 2012, and an amended complaint on February 22, 2013, naming additional defendants.  Defendants United States of America, and the United States Marshal Service Fugitive Task Force were dismissed as

8

immune under the Eleventh Amendment.  After filing motions to dismiss, Defendants State of New Jersey, the New Jersey State Police, and the Atlantic County Sheriff's Office were dismissed. Defendants Atlantic County and the City of Vineland were dismissed without prejudice and Plaintiff was granted leave to file a motion to file a second amended complaint.

Plaintiff filed several letters and a proposed second amended complaint.  The Court has construed his applications to the Court as a motion for reconsideration of the Court's Order granting the motions to dismiss, and as a motion for leave to file a second amended complaint.  The remaining Defendants, Dominick Ferrari, Douglas Herbert, Mark Rowe, Steve Brown, and Richard Henderson, and Defendant City of Pleasantville, have filed motions for summary judgment.

**III. JURISDICTION**

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, and therefore, this Court exercises subjection matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), in that the complaint alleges federal civil rights claims.

**IV. DISCUSSION**

The Court will address Plaintiff's motions first, and then address Defendants' motions for summary judgment.

**A. Motion For Reconsideration**

A motion for reconsideration may be treated as a motion to alter or amend judgment under Fed.R.Civ.P. 59(e), or as a motion for relief from judgment or order under Fed.R.Civ.P. 60(b), or it may be filed pursuant to Local Civil Rule 7.1(i).  The purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence," Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).  A judgment may be altered or amended only if the party seeking reconsideration shows: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. Id.

A motion for reconsideration may not be used to re-litigate old matters or argue new matters that could have been raised before the original decision was reached, P. Schoenfeld Asset Mgmt., L.L.C. v. Cendant Corp., 161 F.Supp.2d 349, 352 (D.N.J. 2001), and mere disagreement with the Court will not suffice to show that the Court overlooked relevant facts or controlling law, United States v. Compaction Sys. Corp., 88 F.Supp.2d 339, 345 (D.N.J. 1999), and should be dealt with through the normal appellate process, S.C. ex rel. C.C. v. Deptford Twp. Bd. of Educ., 248 F.Supp.2d 368, 381 (D.N.J. 2003); U.S. v. Tuerk, 317

F. App'x. 251, 253 (3d Cir. 2009) (quoting <u>Mayberry v. Maroney</u>, 529 F.2d 332, 336 (3d Cir. 1976)) (stating that "relief under Rule 60(b) is 'extraordinary,' and 'may only be invoked upon a showing of exceptional circumstances' ").

The Court construes Plaintiff's letter to the Court as a motion for reconsideration of the Order granting defendants' motions to dismiss.  To briefly summarize the Opinion deciding the motions to dismiss, the Court ruled that Plaintiff's claims against the State of New Jersey and the New Jersey State Police must be dismissed because a State or an arm of the state is not a "person" within the meaning of section 1983.  <u>Morris v. U.S.</u>, No. 12-2926, 2014 WL 1272104, at *3 (D.N.J. Mar. 27, 2014) (citing <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71 (1989)).  Defendants Atlantic County and City of Vineland were dismissed but without prejudice.  Although a municipality can be sued under § 1983, Plaintiff's allegations against Atlantic County and the City of Vineland were deficient.  However, the Court decided to provide Plaintiff another opportunity to allege facts describing a policy, procedure, or custom, rather than just his recitation of the elements of a cause of action against a municipality, unsupported by any set of facts, or based on an untenable theory of vicarious liability.  <u>Id.</u> at *5. Plaintiff's 42 U.S.C. § 1981 claim was dismissed because he

failed to allege discrimination.  <u>Id.</u> at *6.  Plaintiff's 42 U.S.C. § 1985 claim was dismissed because he failed to allege sufficient facts in support of the claim.  <u>Id.</u> at *7.

Plaintiff's Eighth Amendment claim was dismissed because he did not plead sufficient facts to uphold his "cruel and unusual punishment" claim of excessive force.  <u>Id.</u> at *9.  Plaintiff's Fourth Amendment claims for false arrest and the use of excessive force under 42 U.S.C. § 1983 survived.[5]  <u>Id.</u> at *8. Plaintiff's due process claims under the Fifth and Fourteenth Amendments were dismissed as already sheltered within his Fourth Amendment claims.  <u>Id.</u>

Plaintiff asks the Court to reconsider its decision "for the purpose of the defendants have failed to prove that they did not know there was no search warrant and to prove that they

---

[5] In their motions for summary judgment, Defendants state that Plaintiff's claims arise under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) rather than § 1983.  Defendants, who are State officers, maintain that at the time of Morris's arrest, they had been "Special Deputized United States Marshals" assigned as Task Force Officers.  Since, for purposes of the motions for summary judgment, the standard for § 1983 actions is generally applicable to <u>Bivens</u> actions, and any differences between the two are either not applicable or would not affect the outcome, the Court need not make a precise factual determination as to whether the officers were State or Federal actors at this time. <u>See</u> <u>Couden v. Duffy</u>, 446 F.3d 483, 491 (3d Cir. 2006) (stating that a parallel right of action to a § 1983 claim against federal officials exists under the Supreme Court's holding in <u>Bivens</u>).

acted on a barricade of a residential property and arrest of an individual simply by verbal consent from other officers and not by physically seeing the appropriate Court paperwork that would need to be obtained in order to intrude on the Plaintiff's violation of the Fourth Amendment."

It seems that Plaintiff is raising an argument with regard to his Fourth Amendment claim. Plaintiff's Fourth Amendment claim was not dismissed. The Court is going to assume that Plaintiff does not want the Court to reconsider its Order permitting Plaintiff to proceed on his Fourth Amendment claim. To the extent Plaintiff's disagreement is with the Court's Order dismissing his other claims, Plaintiff has not put forth any grounds for reconsideration. Mere disagreement with the Court's decision is not a valid ground for reconsideration of a Court Order. Therefore, Plaintiff's motion for reconsideration will be denied.

**B. Motion For Leave to Amend The Complaint**

The Court dismissed Plaintiff's claims against Atlantic County and the City of Vineland but without prejudice. The Court decided to allow Plaintiff to file a motion for leave to amend his complaint against these defendants. Plaintiff filed a second amended complaint but did not file a motion for leave to amend. Nonetheless, the Court has liberally construed the

second amended complaint as a motion for leave to file an
amended complaint.

Amendments to pleadings are governed by Federal Civil
Procedure Rule 15, which provides that the Court "should freely
give leave when justice so requires." Fed.R.Civ.P. 15(a)(2).
The Third Circuit has shown a strong liberality in allowing
amendments under Rule 15 in order to ensure that claims will be
decided on the merits rather than on technicalities. Dole v.
Arco Chemical Co., 921 F.2d 484, 487 (3d Cir. 1990); Bechtel v.
Robinson, 886 F.2d 644, 652 (3d Cir. 1989). An amendment must
be permitted in the absence of undue delay, bad faith, dilatory
motive, unfair prejudice, or futility of amendment. Grayson v.
Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (citing
Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222
(1962)).

Defendants object to the motion for leave on three grounds:
(1) Plaintiff failed to file a motion for leave and instead just
filed a second amended complaint; (2) the motion is untimely;
and (3) the second amended complaint does not overcome the
deficiencies outlined in the Court's March 27, 2014 Order and
Opinion. Given Plaintiff's *pro se* status, as stated, the Court
will permit Plaintiff to file his proposed second amended
complaint as a motion for leave to amend. Also, although the

14

"motion" is untimely, it was only a few days late and the Court finds no prejudice to defendants in the late filing.

The proposed second amended complaint, however, does not overcome the deficiencies of Plaintiff's claims against Atlantic County or the City of Vineland as noted in Plaintiff's first amended complaint.  In the first amended complaint, Plaintiff alleged in a conclusory fashion that the officers' actions "were pursuant to the customs, policies, and/or practices of the defendants . . . resulting in the need for medical treatment and causing severe personal injuries and emotional distress."  The Court found that Plaintiff failed to allege any "facts" describing a policy, procedure, or custom, and instead merely recited the elements of a cause of action against a municipality, unsupported by any set of facts.  Also, the Court found that the claim was based on an untenable theory of vicarious liability, as evidenced by the allegations regarding the actors' employment status.

The second amended complaint does not correct any of these deficiencies.  Rather, the second amended complaint is identical to the first amended complaint with the addition of the following paragraph:

> Atlantic County and the City of Vineland are
> responsible defendants in this matter based on
> their involvement of the violation of the
> Plaintiff's Fourth Amendment Rights Against

15

Improper Searches and Seizures.  The law
enforcement officers representing Atlantic County
and the City of Vineland were gathered with the
other law enforcement officials who were involved
during the incident that has brought this
Complaint to the Court.  The Plaintiff's wife
witnessed the officials gathered in a parking lot
near their residence on her way to work.  During
this gathering, the issue of having a search
warrant should have been brought up and presented
to all officials involved.  The lack of asking if
a search warrant was present is negligence on all
the officials involved including Atlantic County
and the City of Vineland.

It appears that Plaintiff is alleging that the individual

officers failed to obtain a search warrant before entering his

residence.  This allegation does not provide the facts

sufficient to maintain a claim against either Atlantic County or

the City of Vineland for the same reasons as stated in this

Court's previous Opinion.[6]  Therefore, permitting Plaintiff to

file a second amended complaint would be futile because it does

not correct the deficiencies noted in his first amended

complaint.  Accordingly, Plaintiff's motion to amend his

complaint will be denied, and the claims against Atlantic County

and the City of Vineland will be dismissed with prejudice.

Accordingly, the operative complaint is the first amended

complaint, and all that remains is Plaintiff's Fourth Amendment

---

[6] As discussed, _infra_, the TFOs did not need to obtain a separate
warrant to search the residence since they had a valid arrest
warrant for Adam Bard who was living there and was present in
the home when they entered the residence.

claims against the remaining defendants: Dominick Ferrari, Douglas Herbert, Mark Rowe, Steve Brown, and Richard Henderson (the "individual defendants"), and by defendant City of Pleasantville ("Pleasantville"). These defendants now move for summary judgment.

**C. Motion For Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are

to be drawn in his favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (citing <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); <u>see also Singletary v. Pa. Dept. of Corr.</u>, 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing <u>Celotex</u>, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324.  A "party opposing summary judgment may not rest

18

upon the mere allegations or denials of the ... pleading [s.]"
Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001)
(internal quotations omitted). For "the non-moving party[ ] to
prevail, [that party] must 'make a showing sufficient to
establish the existence of [every] element essential to that
party's case, and on which that party will bear the burden of
proof at trial.'" Cooper v. Sniezek, 418 F. App'x 56, 58 (3d
Cir. 2011) (citing Celotex, 477 U.S. at 322).  Thus, to
withstand a properly supported motion for summary judgment, the
nonmoving party must identify specific facts and affirmative
evidence that contradict those offered by the moving party.
Anderson, 477 U.S. at 256–57.

Additionally, the movant shall furnish a statement which
sets forth material facts as to which there does not exist a
genuine issue, in separately numbered paragraphs citing to the
affidavits and other documents submitted in support of the
motion.  See Local Rule 56.1.  A motion for summary judgment
unaccompanied by a statement of material facts not in dispute
shall be dismissed.  The opponent shall furnish a responsive
statement of material facts, and any material fact not disputed
shall be deemed undisputed for purposes of the summary judgment

motion.[7]  <u>Id.</u>

1. **Individual Defendants - Qualified Immunity**

Plaintiff's claims will be dismissed on summary judgment against the individual Defendants because they are entitled to qualified immunity.  The decision as to "whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury."  <u>Curley v. Klem</u>, 499 F.3d 199, (3d Cir. 2007).  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

---

[7] Plaintiff failed to furnish a responsive statement of material facts and, therefore, any facts not disputed have been deemed undisputed.  <u>See</u> Local Civ.R. 56.1.

The doctrine provides a government official immunity from suit rather than a mere defense from liability, and, thus, the issue of whether qualified immunity applies should be decided at the earliest possible stage in litigation.  Id.  "Qualified immunity ... gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Fiore v. City of Bethlehem, 510 F. App'x 215, 219–20 (3d Cir. 2013) (citing Messerschmidt v. Millender, --- U.S. ----, 132 S. Ct. 1235, 1244, 182 L.Ed.2d 47 (2012)) (internal quotation marks and citations omitted).

Qualified immunity attaches if the official can demonstrate his or her conduct was "objectively reasonable."  See Harlow, 457 U.S. at 818.  "There are two prongs to the objective reasonableness inquiry: first, whether the Plaintiff's constitutional or statutory rights were in fact violated; second, whether it would have been clear to a reasonable officer that the conduct was unlawful." Davis v. Malitzki, 451 F. App'x 228, 232 (3d Cir. 2011) (citing Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).  If the answer to either question is "no," the analysis may end there. See Pearson, 129 S.Ct. at 816; see also Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002) ("If the Plaintiff fails to make out a

constitutional violation, the qualified immunity inquiry is at an end; the [official] is entitled to immunity."). As explained below, the defendants' actions, under these circumstances, were objectively reasonable and defendants are entitled to summary judgment.

### a. Unconstitutional Entry Without a Search Warrant

Plaintiff argues that since the officers failed to secure a search warrant of his home, their entry into his home was illegal. Although defendants did not have a search warrant for Plaintiff's residence, they did have a valid arrest warrant for Adam Bard whom they confirmed was living in the house and was in the house at the time they entered.

Generally, police may not enter the home of a third party to search for someone subject to arrest unless they have a separate search warrant, or the third party's consent. Steagald v. United States, 451 U.S. 204, 222, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). The exception to this general rule is when the person to be arrested also lives at the third party's house. Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."). Under Payton, the

22

arresting officers may enter a home if they have a reasonable belief that the arrestee "(1) lived in the residence, and (2) is within the residence at the time of entry." U.S. v. Veal, 453 F.3d 164, 167 (3d Cir. 2006).  The Court should apply a "common sense approach" and determine "the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality." Id. (citing United States v. Magluta, 44 F.3d 1530, 1535, 1536 (11th Cir. 1995)).

Here, to reiterate the undisputed facts, the TFOs reasonably believed before entering the house that Bard lived at Morris's home and was in the residence on that day.  On May 4, 2010, Detective Garrels and Detective Chris Scott went to Morris's home to locate Bard.  Detective Garrels and Detective Scott spoke with Morris, who confirmed that Bard resided with him and his then-fiancée Angela Bard.  Plaintiff told the detectives that Bard was not home.  The detectives did not enter the home at that time.

On May 13, 2010, defendants Brown, Ferrari, and Rowe went to Morris's home again to locate Bard.  They spoke with Plaintiff who informed them that Bard was not at home and that he would not permit them to search the house without a search warrant. The officers did not enter the house at that time.

On May 18, 2010, the TFOs and members of the NJSP K-9 Unit went to Morris's residence.  When Angela Bard left in her car, TFOs Brown, Ferrari, and Melchiore conducted a motor vehicle stop and asked her whether Bard was home.  Angela Bard called Morris who knocked on the bedroom door and heard Morris tell Bard to get up because the Marshals were coming to pick him up.  Angela Bard verified for the TFOs that her brother was in the house.  After confirming that Bard was in the house, the TFOs knocked on the front door several times.  Morris opened the window overlooking the front of the house and asked the TFOs what they wanted.  The TFOs responded that they had a warrant for Bard and to open the front door or they would open it forcibly.  Morris refused.  The TFOs forced the front door open, entered the home and arrested Bard.

Based on these facts, it was reasonable for the TROs to believe that Bard was living at Morris's residence and that he was inside the house at the time the TROs entered the house and arrested him.  Therefore, their entry into Morris's home without a search warrant was not unlawful.  See Williams v. City of Philadelphia, 454 F. App'x. 96, 99 (3d Cir. 2011) ("Given that the officers reasonably believed that Peno lived at this address and was inside [Williams'] home, they properly entered on the authority of the arrest warrant.").  Since it did not violate

24

the Fourth Amendment for the officers to enter the house under
these circumstances the officers are entitled to qualified
immunity.

### b. Excessive Force

Plaintiff's Fourth Amendment claims of excessive force will
be dismissed because the defendants' conduct was objectively
reasonable.  The Fourth Amendment to the United States
Constitution provides that "[t]he right of the people to be
secure in their persons ... against unreasonable searches and
seizures, shall not be violated." U.S. Const., amend. IV.  "To
state a claim for excessive force as an unreasonable seizure
under the Fourth Amendment, a Plaintiff must show that a
'seizure' occurred and that it was unreasonable." Brower v.
County of Inyo, 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d
628 (1989), cited in Lamont v. New Jersey, 637 F.3d 177, 182–83
(3d Cir. 2011).  See also Graham v. Connor, 490 U.S. 386, 395,
109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("all claims that law
enforcement officers have used excessive force — deadly or not —
in the course of an arrest, investigatory stop, or other
'seizure' of a free citizen should be analyzed under the Fourth
Amendment and its 'reasonableness' standard").

A seizure triggering Fourth Amendment protection occurs
when a government actor "by means of physical force or show of

25

authority, has in some way restrained the liberty of a citizen."
Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d
889 (1968).  To determine the reasonableness of a seizure, a
court "must balance the nature and quality of the intrusion on
the individual's Fourth Amendment interests against the
importance of the governmental interests alleged to justify the
intrusion."  United States v. Place, 462 U.S. 696, 703, 103
S.Ct. 2637, 77 L.Ed.2d 110 (1983), quoted in Graham v. Connor,
490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 and Scott v.
Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686
(2007).  Proper application of this objective reasonableness
standard "requires careful attention to the facts and
circumstances of each particular case, including the severity of
the crime at issue, whether the suspect poses an immediate
threat to the safety of the officers or others, and whether he
is actively resisting arrest or attempting to evade arrest by
flight."  Graham v. Connor, 490 U.S. at 396; quoted in Groman v.
Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  Other
factors to be considered include " 'the duration of the
[officer's] action, whether the action takes place in the
context of effecting an arrest, the possibility that the suspect
may be armed, and the number of persons with whom the police
officers must contend at one time.'" Couden v. Duffy, 446 F.3d
483, 497 (3d Cir. 2006) (citations omitted).  Ultimately, "the

26

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.

Here, there is no dispute that a seizure occurred. Plaintiff was arrested and taken into custody.  Plaintiff argues that the TROs used excessive force while arresting him. Plaintiff testified that he started walking down the stairs from his second floor, with his hands behind his head.  He testified that Henderson pushed and shoved him from behind while handcuffing him; that Rowe hit him one time near his right eye with the butt of a rifle; and that Brown, Ferrari, and Herbert failed to intervene to protect him.  He also testified that during the handcuffing there was "[s]ome pummels and pounding and like shoving and pushing like" towards his head and upper back.

Defendants argue that Plaintiff's claims against Henderson relate to the actions Henderson took while trying to handcuff Plaintiff, while Plaintiff was actively resisting arrest. Defendants state that Plaintiff's complaint is that he did not like Henderson's method in handcuffing him, but that Plaintiff did not testify that Henderson actually struck him.  Defendants maintain that, in light of the acts of the Plaintiff and

27

circumstances confronting the TFOs, none of the techniques Henderson used was objectively unreasonable.  They state that Plaintiff had demonstrated a hostile and uncooperative attitude toward the TFOs in the past; that the TFOs were well aware that Plaintiff harbored an intense dislike for law enforcement authorities; that while trying to arrest him, Plaintiff ignored the TFOs' multiple directives to show them his hands and this increased the safety risk to the TFOs because they could not determine if Plaintiff was armed; that at the time Henderson and Melchoire were attempting to handcuff Plaintiff, the second floor of the house had not been cleared and the TFOs did not know if there was anyone else present in the residence; and that Plaintiff was actively resisting arrest at the time of Henderson's actions.

Defendants also submit the audio recording and the transcript of the recording of the telephone call Plaintiff made to the NJSP Office of Professional Standards.  The audio recording begins with Plaintiff telling the operator that officers had entered his house with guns.  The sound of a barking dog is heard throughout the tape.  The transcript of the recording states that Plaintiff was told several times to put his hands behind his head.  It also states that Plaintiff was told several times to stop resisting.  Not including the time

28

Plaintiff spoke to the operator from the NJSP Office of
Professional Standards, the physical arrest took approximately
57 seconds.

This Court's review of all the undisputed facts and
circumstances of this arrest leads us to conclude that the
actions of Henderson were reasonable under the circumstances.
Although Plaintiff's suspected crimes were not severe, his
behavior after the TFOs entered the house posed a potential and
immediate threat to the safety of the officers.  When they
entered the home, Plaintiff did not come down the stairs
immediately and place his hands above his head as he had been
instructed.[8]  The facts and testimony show that Plaintiff was
pushed to the ground by Henderson only because Plaintiff ignored
his direction to lie belly down on the stairs which would have
allowed his arms to be extended behind his back and cuffed.
Plaintiff testified that his position on the stairs made it
impossible for his arms to go over his head and that his arms
kept "bouncing" and Henderson kept trying to snatch his arms.

---

[8]    Defendants also rely on the fact that Plaintiff refused to
allow the TFOs to enter after they knocked and informed him that
they had an arrest warrant for Bard.  This fact, however, is not
necessarily further evidence that Morris was uncooperative.  A
jury could believe that Plaintiff's refusal to allow the TFOs to
enter without a search warrant was based on a genuinely held,
albeit incorrect, belief that they needed a search warrant, in
addition to the arrest warrant for Bard.

However, that situation was of Plaintiff's own making.  It appears uncontested that Henderson was unable to handcuff Plaintiff simply because of their positions on the stairs and Plaintiff's refusal to follow the officer's initial and continuing instructions.  Although Plaintiff describes it as pulling and shoving, it is clear that Henderson was struggling with Plaintiff to put the handcuffs on him.  It was not unreasonable for Henderson, during the course of the arrest, to view Plaintiff's actions as resisting arrest.  See Graham v. Connor, 490 U.S. 386, 396 109 S.Ct. 1865 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight...[and] '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment.") (citations omitted).  Indeed, Plaintiff was convicted of that very crime and his conviction upheld on appeal.  Further, there is no testimony that Henderson ever struck or hit Plaintiff beyond the physical force necessary to secure the handcuffs.  Accordingly, Plaintiff's excessive force claims against Henderson will be dismissed.

With regard to Rowe, although not expressly alleged in the Amended Complaint, Plaintiff states that Rowe hit him in the

face with the butt of a rifle causing an orbital fracture.
Plaintiff states that he did not know that he was injured at the
time, or later at the police station.  Plaintiff refused medical
help when it was offered by the officers at the police station.
Plaintiff testified that after arriving home, he blew his nose
and blood came out and his eye had "swelled up and looking
crazy."  He states that he went to the hospital and was told
that he had a fractured orbital lobe.

Rowe testified that he did not strike Plaintiff, or use a
rifle butt to strike him.  Defendants also rely on the audio
recording taken during Plaintiff's call to the NJSP Office of
Professional Standards; more particularly, that during the
arrest there is no indication from Plaintiff that he was struck
in the face with a rifle butt.  Defendants also submit a
photograph of Plaintiff taken after his arrest.  Taken from a
wide view, it does not disclose any bruising, bleeding, or other
form of trauma from a sharp blow to the head.  In addition,
Plaintiff was asked at the police station if he was injured and
wanted medical treatment.  Plaintiff did not say he was injured
and declined medical treatment.

At this point in the proceedings, Plaintiff must come
forward with evidence that the force used by the Defendant was
excessive.  As stated, this is a balancing test in which the

31

amount of force is weighed against the surrounding circumstances
and the facts available to the officer.  See Place, 462 U.S. at
703; Maryland v. Garrison, 480 U.S. 79, 85, 107 S.Ct. 1013, 94
L.Ed.2d 72 (1987).  The relevant inquiry is the reasonableness
of the officer's belief as to the appropriate level of force
which is judged from on-scene perspective of the officer and not
in the "20/20 vision of hindsight."  See Saucier, 533 U.S. at
205.

    There is no dispute that Plaintiff and the arresting
officers engaged in a struggle while Henderson was trying to
handcuff Plaintiff and that Plaintiff's arm "bounced" back
hindering the arrest.  It is not disputed that Plaintiff refused
to allow the officers in his home, did not show himself until
given repeated instructions to do so and only after a dog was
unleashed, did not place his hands above his head or at a later
time behind him as instructed, and maintained an uncooperative,
hostile attitude towards them.  It is also not disputed that the
upper level of the residence was not secured at the time of the
arrest.  All of this occurred just minutes after Bard, a subject
in a murder investigation, was arrested in the same house on the
same steps by the same team of officers without incident.

    While it appears undisputed that Plaintiff suffered an
injury to his eye socket, all the other evidence establishes

that the injury was the unintended consequence of the force Rowe

and the other officers found necessary to secure an

uncooperative arrestee.[9]  See Revak v. Lieberum, 398 F. App'x.

753, 754-55 (3d Cir. 2010) (affirming grant of summary judgment

where officers pepper sprayed an arrestee who was yelling

obscenities and refusing to move his arms so that the officers

could handcuff him); Pridgen v. Law, 299 F. App'x. 211, 212 (3d

Cir. 2008) (affirming judgment in favor of officer, who when

trying to arrest Plaintiff, fell along with Plaintiff on an

overturned couch and Plaintiff hit his head on the floor,

causing a bloody nose and was later diagnosed with a broken

---

[9] The only evidence supporting a claim that Rowe struck Plaintiff
with the butt of a rifle – a use of force that would be
unreasonable and excessive in most situations – is Plaintiff's
self-serving deposition testimony to that effect.  Indeed, even
this testimony is suspect in that Plaintiff contradicts himself
by separately asserting in his brief in opposition that he came
down the steps backwards and concludes he must have been struck
by a "pistol" to the face.  His post-incident statement on May
18, 2010 claims his injuries were caused by being "slammed …
into the steps[]" and makes no mention of a rifle or pistol.
More importantly, however, is the simple fact that all the other
evidence in the case establishes the injury resulted from a
substantial scuffle on the stairs attendant to the arrest and
handcuffing.  Whether it is the supposition of being struck by a
pistol, a claim belatedly raised by Plaintiff in his brief, or
the claim of a rifle butt strike made at his deposition, in the
absence of some supporting evidence Plaintiff's self-serving
statements do not create a dispute of material fact sufficient
to defeat summary judgment. Williams v. Borough of West Chester,
Pa., 891 F.2d 458, 460 (3d. Cir. 1989)(non-moving party cannot
simply reassert factually unsupported allegations contained in
pleadings).

facial bone).  Accordingly, Plaintiff's claims for excessive force against Rowe will be dismissed.

With respect to Plaintiff's claims against Brown, Ferrari, and Herbert for failure to intervene to protect him from excessive force, Plaintiff's claims fail because he has not established that any of the TFOs used excessive force. Plaintiff has testified that neither Brown, Ferrari, nor Herbert struck him or were physically abusive toward him.  Accordingly, Plaintiff's claims for excessive force will be dismissed.

### c. False Arrest

Plaintiff's claim of Fourth Amendment violation for false arrest will be dismissed because the officers had probable cause to arrest Plaintiff.  To state a Fourth Amendment claim for false arrest, a Plaintiff must allege two elements: "(1) that there was an arrest; and (2) that the arrest was made without probable cause." James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012) (citing Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995) and Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988)).  Probable cause exists "whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested."  United States v.

Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Beck v. State of
Ohio, 379 U.S. 89, 91 (1964)).  "Probable cause ... requires
more than mere suspicion; however, it does not require that the
officer have evidence to prove guilt beyond a reasonable doubt."
Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir.
1995).

Here, Plaintiff can prove the first element, that he was
arrested.  Defendants argue that because Plaintiff was found
guilty of resisting arrest,[10] he is not able to prove that the
officers lacked probable cause and, therefore, cannot prove the
second element.  Even though Plaintiff was found guilty of
resisting arrest, a claim for false arrest does not necessarily
implicate the validity of a conviction or sentence.  See Gibson
v. Superintendent of N.J., 411 F.3d 427, 449 (3d Cir. 2005);
Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998).  At
this juncture, the Court does not simply rely on the underlying
conviction, but instead makes a fact-based inquiry to determine
whether a successful § 1983 action would undermine the validity
of the conviction or sentence.  See Gibson, 411 F.3d at 451.

---

[10] Plaintiff was found guilty in state court of the charge of
resisting arrest.  Under New Jersey law, "a person is guilty of
a disorderly persons offense if he purposely prevents or
attempts to prevent a law enforcement officer from effecting an
arrest."  N.J.S.A. 2C:29-2(a)(1).  Plaintiff's conviction was
affirmed on two levels of appeal.

The proper inquiry in a claim for false arrest under § 1983 is "not whether the person arrested in fact committed the offense, but whether the arresting officers had probable cause to believe the person arrested had committed the offense." See <u>Dowling v. City of Philadelphia</u>, 855 F.2d 136, 141 (3d Cir. 1988).

Based on a complete review of the underlying state court decision and deposition transcripts, there is clear evidence that the TFOs had probable cause to charge Plaintiff with resisting arrest. The evidence shows that Plaintiff did not comply with instructions to put his hands behind his back when the officers tried to handcuff him. Therefore, there was probable cause to arrest Plaintiff for resisting arrest. Moreover, the state trial court, as fact finder, found that Plaintiff resisted arrest and violated New Jersey law. <u>See</u> N.J.S.A. 2C:29-2(a)(1). A finding that there was no probable cause to arrest Plaintiff in this litigation would imply the invalidity of his prior conviction, and therefore, the claim is barred under <u>Heck</u>. <u>See</u> <u>Heck v. Humphrey</u>, 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (Supreme Court held that a Plaintiff may not recover damages under § 1983 if doing so would imply the invalidity of a prior conviction).

Accordingly, all claims against the individual defendants will be dismissed and their motion for summary judgment granted.[11]

## 2. City of Pleasantville

The City of Pleasantville will be dismissed because Plaintiff has not alleged any facts describing a policy, procedure, or custom by a City of Pleasantville policy maker that resulted in Plaintiff's injury.  Municipalities and other local government units are among those "persons" to which section 1983 liability applies.  Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690 (1978).  To establish municipal liability under § 1983, "a Plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990), quoted in Blanche Rd. Corp. v. Bensalem Twp., 57 F.3d 253, 269 n.16 (3d Cir.), cert. denied, 516 U.S. 915 (1995), and quoted in Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 126 (3d Cir. 2000).  A Plaintiff must demonstrate that, through its deliberate conduct, the municipality was the

---

[11] Because the Court grants summary judgment on grounds of qualified immunity, it will not address the Defendants' alternative grounds for dismissal.

moving force behind the Plaintiff's injury.  <u>Monell</u>, 436 U.S. at 689.

"A policy is made 'when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict.'"  <u>Natale</u>, 318 F.3d at 584 (citations omitted).  "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'"  <u>Id.</u> (citation omitted). There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983.  The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy."  The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself."  Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately

indifferent to the need.'"  Natale, 318 F.3d at 584 (footnote
and citations omitted).

However, local government units and supervisors are not
liable under § 1983 solely on a theory of *respondeat*
*superior*.  See City of Oklahoma City v. Tuttle, 471 U.S. 808,
824 n.8 (1985); Monell v. New York City Department of Social
Services, 436 U.S. 658, 690-91, 694 (1978) (municipal liability
attaches only "when execution of a government's policy or
custom, whether made by its lawmakers or by those whose edicts
or acts may fairly be said to represent official policy,
inflicts the injury" complained of); Natale v. Camden County
Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003). "A
defendant in a civil rights action must have personal
involvement in the alleged wrongs, liability cannot be
predicated solely on the operation of *respondeat superior*.
Personal involvement can be shown through allegations of
personal direction or of actual knowledge and
acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d
Cir. 1988) (citations omitted).  Accord Robinson v. City of
Pittsburgh, 120 F.3d 1286, 1293-96 (3d Cir. 1997); Baker v.
Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

The City of Pleasantville has filed for summary judgment
arguing that Plaintiff has not alleged any facts that could show

that a custom or policy of the City of Pleasantville caused his injury, or that it disregarded the training, screening or supervision of Detective Henderson.  Plaintiff has not presented any evidence to rebut the arguments presented by the City of Pleasantville.  See Anderson, 477 U.S. at 256-57 (To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party); Cooper, 418 F. App'x at 58 (for the non-moving party to prevail, he must make a showing sufficient to establish the existence of every element essential to his case).  Accordingly, the City of Pleasantville's motion for summary judgment shall be granted.

### V.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for reconsideration will be denied, his motion to amend his complaint will be denied, and Defendants' motions for summary judgment will be granted.

An appropriate Order will be entered.

s/Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.

Date: December 29, 2014

At Camden, New Jersey